UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COINMINT, LLC,

    Plaintiff,

v.

DX CORR DESIGN, INC., et al.,

    Defendants.

Case No. 23-cv-00599-RS

**ORDER GRANTING STAY PENDING ARBITRATION, DENYING MOTION TO DISMISS, AND DENYING MOTIONS TO SEAL**

## I. INTRODUCTION

Plaintiff Coinmint, LLC ("Plaintiff") is a Bitcoin mining company[1] that owns and runs one of the largest digital currency data centers in the world. For assistance with mining, Plaintiff entered into a Sales and Purchase Agreement ("SPA") to purchase Bitcoin mining rigs from nonparty Katena Computing Technologies ("Katena") on May 12, 2021. Pursuant to the SPA, which Plaintiff avers was fraudulently induced, Plaintiff made over $23 million in deposit payments to Katena, yet allegedly received nothing. After Plaintiff demanded assurances of performance and an accounting of the deposit payments, Katena terminated the agreement and refused to refund the deposits. As a result, Plaintiff initiated an arbitration case against Katena on April 27, 2022, pursuant to the arbitration clause in the SPA.

On January 27, 2023, Plaintiff separately brought suit in the Santa Clara Superior Court

---

[1] Bitcoin mining refers to the process whereby new Bitcoin is created. As it requires specialized and highly powerful computers for verifying and recording transactions on the blockchain (a decentralized ledger that records and secures Bitcoin transactions), such mining is expensive.

1  against seven entities—(1) DX Corr Design Inc. ("DX Corr"), a computer chip design company

2  that performed chip simulations for Katena; (2) Sagar Reddy (principal and owner of DX Corr, as

3  well as a cofounder and the CTO of Katena); (3) Robert Bleck (an independent expert retained by

4  Coinmint to evaluate Katena prior to signing the contract); (4) Jim Denaut (the CEO of Coinmint);

5  (5) Frank Kinney (the COO of Coinmint); (6) Michael Maloney (the CFO of Coinmint); and (7)

6  unnamed DOES 2-40—alleging eight causes of action: fraud, breach of fiduciary duty, aiding and

7  abetting of breach of fiduciary duty, breach of contract, breach of the covenant of good faith and

8  fair dealing, conspiracy, intentional interference with contractual relations, and UCL claims. On

9  February 9, 2023, Defendant Reddy removed the lawsuit to federal court.

10  Defendant Reddy has filed a motion to stay the action pending completion of the

11  arbitration, arguing that the lawsuit is based on issues referrable to arbitration, or else the issue of

12  arbitrability is committed to the arbitrators. Plaintiff argues that a stay is inappropriate, as none of

13  the Defendants are party to the SPA's arbitration agreement, which is solely with Katena.

14  Separately, Defendant Dx Corr has filed a motion to dismiss, on the basis that Plaintiff failed to

15  state a claim because it offered insufficient factual allegations against Dx Corr specifically.

16  Finally, there are several administrative motions with requests to seal portions of Plaintiff's

17  Opposition to the Motion to Stay, the First Amended Complaint, and Opposition to the Motion to

18  Dismiss, along with many of the exhibits attached thereto.

19  For the reasons that follow, the motion to stay the matter pending arbitration is granted, the

20  motion to dismiss is denied without prejudice to renewal after the stay is lifted, and the motions to

21  seal are denied as overbroad, without prejudice to bringing a properly formulated, narrower

22  request to seal.

## II. DISCUSSION

24  Defendant Reddy files its motion to stay the action pursuant to § 3 of the Federal

25  Arbitration Act ("FAA"), which governs the enforceability of arbitration agreements in contracts

26  involving interstate commerce. That section provides as follows:

27  If any suit or proceeding be brought in any of the courts of the United States upon

any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. If issues in a case before it are "referable to arbitration," therefore, a court "shall . . . stay the trial of the action until such arbitration." *Id.*; *see Johnmohammadi v. Blooomingdale's, Inc.,* 755 F.3d 1072, 1073-1074 (9th Cir. 2014) (explaining that district courts have discretion either to stay or dismiss actions when all of the claims raised in the action are subject to arbitration).

### A. Validity of Arbitration Agreement

As a threshold matter, there is no question that the SPA contains an agreement to arbitrate. Although Plaintiff challenges the validity of the SPA as a whole (an argument addressed in the arbitrability section, below), it does not specifically challenge the arbitration provision itself—and certainly could not, given that it was Plaintiff that voluntarily commenced the arbitration action against Katena. By its very actions, therefore, Plaintiff concedes the validity of the agreement to arbitrate in the SPA.

### B. Scope of the Arbitration Agreement

Presuming a valid agreement to arbitrate, the only remaining questions are whether the arbitration clause encompasses the disputes at issue and can be extended to Defendants, who are non-parties to the SPA. § 19.2 of the SPA, which contains the arbitration clause, provides in relevant part: "Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination hereof . . . shall be referred to and finally resolved by arbitration administered by American Arbitration Association . . . ." As Defendant notes, this language is broad, encompassing "any dispute . . . relating to this Agreement," and specifically including disputes regarding the SPA's "existence" or "validity." SPA § 19.2. The very first count in Plaintiff's complaint, fraud, claims that Defendants Denaut, Kinney, and Maloney knowingly repeated false representations "with the

intent to induce Coinmint to rely on them so that Coinmint would sign the S&P Agreement and First PO and advance deposit payments to Katena." Dkt. 23-3 at 16. As such, the essence of the injury caused by Defendants' alleged fraud is Plaintiff's reliance thereupon, leading to the signing of and adherence to the SPA and obligations described therein. That certainly is a dispute and a controversy arising out of or relating to the SPA. Moreover, many of the other issues raised by Plaintiff in this action—breach of contract, intentional interference with contractual relations, breach of fiduciary duty, aiding and abetting of breach of fiduciary duty—similarly fall under the scope of the arbitration clause, as they concern the contract Plaintiff had with Defendant Bleck to provide due diligence and an independent evaluation of Katena. The theory of harm here, again, arises out of the alleged conspiracy between Defendants and Katena to induce Plaintiff into the fraudulent SPA. Defendant is therefore correct that the SPA is at the very heart of Plaintiff's suit, and is encompassed under its arbitration clause.

### C. Application to Non-Signatories

While the FAA reflects a "liberal federal policy favoring arbitration," *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)), it is also true that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* (citation omitted). Generally, therefore, arbitration "may not be invoked by one who is not a party to the agreement," unless she "otherwise possess[es] the right to compel arbitration." *Id.* (citation omitted).

Under *Arthur Andersen LLP v. Carlisle*, the Supreme Court has indicated that "a non-signatory party may seek a stay pursuant to [FAA] § 3 'if the relevant state contract law allows him to enforce the [arbitration] agreement.'" *STM Atl. N.V. v. Dong Yin Dev. Holdings Ltd.*, No. 218CV01269JLSJCG, 2019 WL 2417625, at *3 (C.D. Cal. Feb. 15, 2019) (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009)). Under California law, non-signatories may invoke arbitration agreements under limited circumstances, including under equitable estoppel, the doctrine on which Defendant Reddy relies. *In re Henson*, 869 F.3d 1052, 1060 (9th Cir. 2017).

The theory underlying the doctrine is to prevent a party from "seek[ing] to hold the non-signatory liable pursuant to duties imposed by the agreement . . . but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Id.* (citation omitted). In other words, equitable estoppel tries to prevent a plaintiff from suing under the terms of the agreement containing the arbitration clause, but ignoring the arbitration requirement because the Defendant is a non-signatory. *Id.*

With this theory in mind, California law applies equitable estoppel to two circumstances where a non-signatory seeks to enforce an arbitration clause: "(1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are 'intimately founded in and intertwined with' the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and 'the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement.'" *Kramer*, 705 F.3d at 1129 (quoting *Goldman v. KPMG LLP,* 173 Cal. App. 4th 209, 218-19 (2009)).

Defendant's arguments prevail under either prong of this test. With respect to the first prong, and as explained above, Defendant is correct that the claims Plaintiff advances in this lawsuit are "intimately founded in and intertwined with" the underlying SPA. *Id.* Plaintiff's claims against Defendants and against Katena are "based on the same facts and are inherently inseparable," *Metalclad Corp. v. Ventana Env't Organizational Partnership*, 109 Cal. App. 4th 1705, 1718 (2003), hence the fact that "Katena" appears 158 times in the twenty-two page Complaint[2]; that Plaintiff sought discovery, depositions, and evidentiary testimony from several of the Defendants in this action in its arbitration (DXCorr, Reddy, Maloney, DeNaut, and Bleck); and that Plaintiff seeks, at minimum, a return of the $23 million dollars it paid pursuant to the SPA. Considering all the facts and the context underlying the case, the nexus between the SPA and Plaintiff's claims against Defendants, as well as the integral relationship between Defendants and

---

[2] "Katena" appears 186 times in the First Amended Complaint.

1    Katena, find in favor of the application of equitable estoppel. *See Metalclad*, 109 Cal. App. 4th at
2    1717–18.
3            For the same reasons, Plaintiff's case is also one where "the signatory alleges substantially
4    interdependent and concerted misconduct by the nonsignatory [Defendants] and another signatory
5    [Katena] and the allegations of interdependent misconduct [are] . . . intimately connected with the
6    obligations of the underlying agreement." *Kramer*, 705 F.3d at 1129. Although Plaintiff is correct
7    that it had no arbitration obligations with its former employees (*i.e.*, Defendants DeNaut, Kinney,
8    etc.), for example, Plaintiff's complaints against them are grossly intertwined in the circumstances
9    relating to the underlying subject of the arbitration (the SPA with Katena). As in *STM Atlantic*,
10   "Plaintiffs' claims against [the non-signatory Defendants] stem from allegations of a concerted
11   effort" by Defendants and Katena fraudulently to induce Plaintiff into signing the SPA and other
12   agreements. S*TM Atlantic*, 2019 WL 2417625, at *6. Those arguments amount to "[f]ar more than
13   allegations of parallel misconduct resulting in discrete injuries to Plaintiffs"; instead, "Plaintiff[]
14   allege[s] a single scheme to achieve a single aim." *Id.*
15           *STM Atlantic* is also notable as Plaintiffs therein argued that their arbitration did not
16   implicate their lawsuit, because their claims against non-signatory Defendants arose from "*fraud
17   antecedent to the contract*." The Court did not credit this argument, reasoning that "although
18   Plaintiffs allege a fraud stretching far back in time, their ultimate injuries are the precipitate of
19   contractual rights and obligations manifested in the [agreement]." *Id.* Here, the ultimate injury
20   Plaintiff faced as a result of the fraud, breach of fiduciary duty, and breach of contract (among
21   others) it alleges in the lawsuit was precipitated by the obligations arising out of, and undertaken
22   pursuant to, the SPA.
23           In response, Plaintiff argues that "equitable estoppel is fundamentally about fairness," and
24   that Plaintiff is not seeking to "have it both ways," as they are not seeking to hold non-signatory
25   Defendants liable for any obligations specified in the SPA. *In Re. Pacific Fertility Center
26   Litigation* (2020) 814 Fed.Appx. 206, 210 (cleaned up). By Plaintiff's read, the SPA "called for
27   the manufacture and delivery of mining rigs"; because Plaintiff seeks neither to impose a duty to
28

supply mining rigs nor to hold Defendants liable in damages for a failure to deliver such mining rigs, the SPA is not implicated in Plaintiff's suit.

This argument reads the caselaw—and Plaintiff's claims—too narrowly. For the reasons discussed above, the circumstances under which the SPA was entered into and the obligations Plaintiff undertook pursuant to the SPA (including the deposits it made) are part and parcel of the allegations against Defendants in this suit. That Plaintiff does not seek specific performance in the form of delivery of mining rigs by Defendant—which Defendants would be unable to fulfill, in any case—is therefore unpersuasive. This is simply not a situation, as Plaintiff suggests, where the claims against the non-signatories merely "reference the existence of the contract that includes the arbitration clause." Dkt. 19-1 at 22.

Plaintiff's invocation of *Goldman*'s holding is unavailing. In *Goldman*, two Plaintiffs sued over fraudulent tax shelter schemes perpetrated by their former accountants, lawyers, and investment advisers. *Goldman*, 173 Cal. App. 4th at 213. After Plaintiffs engaged the accounting firm KPMG to provide tax planning and strategy advice, KPMG pitched an investment scheme whereby in exchange for payments of $2.1 million, a tax loss of as much as $61 million could be generated. For this scheme to work, KPMG and the law firm Sidley Austin would independently provide Plaintiffs with opinion letters stating that a deduction taken for losses generated by that investment would be upheld if challenged by the IRS. Plaintiffs were then introduced by KPMG to investment advisor DGI, which founded and managed the limited liability company through which Plaintiffs would make the investment. The standard operating agreements between Plaintiffs and DGI (for Plaintiffs' membership in the limited liability companies) contained arbitration clauses, but Plaintiffs' engagement contracts with KPMG and Sidley Austin did not. *Goldman* found that Plaintiffs could not be compelled to arbitrate their claims against KPMG and Sidley Austin due to Plaintiffs' contracts with DGI, because those operating agreements that Plaintiffs signed "in order to become members of the limited liability company through which their tax losses would be generated were merely incidental to the scheme, and none of the terms in those agreements [were] alleged to have been violated or otherwise to form any part of [Plaintiffs'] complaints." *Id.* at 233.

*Goldman* does explain that "[p]arties who have not agreed to arbitrate may not be compelled to do so simply because two defendants, one with an arbitration agreement and one without, have colluded to defraud the plaintiff," because "*every* conspiracy claim alleges interdependent and concerted misconduct." *Id.* at 234. Yet Plaintiff superficially quotes that passage, without contending with the factual observations that the California Court of Appeal found salient in its analysis. *Goldman* explained that the operating agreements that Plaintiff had with the non-signatories were "at least one step removed from the actual transactions that generated the . . . complaints against KPMG and Sidley." *Id.* at 233. Indeed, the Court noted that "the substance of the fraud allegedly perpetrated by KPMG on [Plaintiffs] . . . occurred well in advance of [Plaintiffs'] execution of the operating agreements," *Id.* The "fundamental" point in the analysis was that Plaintiffs are "*not* relying in any way on the operating agreements to make their claims against KPMG and Sidley," *id.*; in fact, the operating agreements were not even mentioned in the complaints. *Id.* at 219. This stands in contrast with the case here, where the SPA plays a central role in the fraud and "Katena" features prominently in the Complaint. Put another way: the operating agreements with DGI were "merely a procedural and collateral step in the creation of the fraudulent tax shelters," *id.*, which cannot be said of the SPA.

### D. Issues of Arbitrability

Finally, Defendant also argues that in the alternative, any questions of arbitrability must be decided by the arbitrator. Plaintiff responds by arguing that it is "well settled" that the Court, rather than an arbitrator, must decide whether the parties have entered into a valid and binding agreement to arbitrate the dispute in question.

"It is true that arbitration may be refused where grounds exist for revocation of the *agreement to arbitrate.*" *Johnson v. Siegel*, 84 Cal. App. 4th 1087, 1094 (2000) (citing Code Civ. Proc., § 1281; 9 USCA § 2; and *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal. 4th 951, 973 (1997)). "Fraud in the inducement of the *underlying contract,* however, is not sufficient to defeat an arbitration clause"; accordingly, "where there is an arbitration cause, courts may not consider 'claims of fraud in the inducement of the contract generally.'" *Id.* (quoting *Prima Paint v.*

*Flood & Conklin*, 388 U.S. 395, 403–04 (1967)). On the theory that "[a]n arbitrator is competent and empowered to decide issues related to fraud in the inducement of the underlying contract," *Johnson*, 84 Cal. App. 4th at 1094, "a claim of fraud in the inducement of the contract generally . . . is for the arbitrators and not for the courts," *Prima Paint*, 388 U.S. at 400.

This conclusion also comports with Rule 7 of the AAA commercial arbitration rules, which are explicitly referenced and thereby incorporated into the SPA's arbitration clause: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." Rule R-7(a).

### E. Motions to Seal

The motions to seal with respect to the Oppositions, the First Amended Complaint, and the exhibits attached thereto are denied. The strong presumption in favor of public access has not been overcome: the vast majority of that sought to be sealed will not qualify for sealing, and it is an open question if any of the identified material qualifies as sealable. Defendant claims, for instance, that certain "commercially sensitive business information" should be sealed, lest it "injure [Katena's] competitive standing in a very competitive industry." Dkt. 28 at 5. Yet it is certainly a stretch to argue that a statement such as "Katena is a corporation founded by Michael Gao, Henry Monzon, and Sagar Reddy" (Dkt. 19-1 at 8), or descriptions or photographs of the storefront of the business address listed with the California Secretary of State for Dx Corr (which are publicly observable), would be commercially sensitive. No real attempt is made to explain what information is sensitive, or how it would impact Katena's competitive standing. Of course, that the material may be embarrassing does not render otherwise non-sensitive information sealable. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). ("The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records."). Defendant also suggests that the information should be sealed because it has been included for an improper purpose, but many of the communications included in the exhibits were used to further Plaintiff's argument that the contract with Katena was fraudulently induced and therefore arbitration—

1  including a stay for the pendency of such arbitration—would in fact be inequitable. That this

2  argument was ultimately not meritorious does not mean, however, that it was purely made out of

3  spite or otherwise improper.

4  Nor are the proposed redactions adequately tailored. Across the two motions, Defendant

5  Reddy seeks to seal 30 exhibits in their entirety, and nearly all of the reasons given for sealing are

6  either boilerplate or a blanket assertion of confidentiality. That does not furnish the "compelling

7  reasons supported by specific factual findings" that the law requires for information to be sealed.

8  *Kamakana*, 447 F.3d at 1179. Indeed, "[r]eference to a stipulation or protective order that allows a

9  party to designate certain documents as confidential is not sufficient to establish that a document,

10  or portions thereof, are sealable." Civil Local Rule 79-5(c); *see also id.* 79-5(a) ("A party must

11  explore all reasonable alternatives to filing documents under seal . . . and avoid wherever possible

12  sealing entire documents (as opposed to merely redacting the truly sensitive information in a

13  document)."); *Glob. Indus. Inv. Ltd. v. 1955 Cap. Fund I GP LLC*, No. 21-CV-08924-HSG, 2022

14  WL 6282723, at *2 (N.D. Cal. Sept. 23, 2022) ("[G]ood cause 'cannot be established simply by

15  showing that the document is subject to a protective order or by stating in general terms that the

16  material is considered to be confidential.'") (citations omitted).

17  The requests to seal are therefore denied without prejudice. To the extent there are true

18  business exigencies or privacy interests that compel sealing, such as the privacy interests of non-

19  party employees who are not directly implicated by the allegations in this case, a narrower

20  proposal for sealing, if appropriate, is due within twenty one days of this order. Such motion must

21  identify with specificity what information should be sealed, what injury would result if sealing is

22  denied, and why any less restrictive alternative is insufficient.

### III. CONCLUSION

24  As the disputes in this action are either subject to arbitration due to equitable estoppel or

25  reserved for the arbitrator to decide whether they are arbitrable, concurrent litigation dealing with

26  many of the same "core issues" would risk potentially inconsistent rulings. Because the

27  arbitrator's decision on those core issues (such as the validity of the SPA) will be binding on

Plaintiff, and may affect Plaintiff's claims, the motion to stay this action pending arbitration will be granted. The Parties are directed to file a notice on the docket no later than two weeks after arbitration is concluded.

The potential for overlap in factual issues applies also to Defendant DX Corr, from which discovery in the arbitration was also sought. In light of the stay of this litigation, therefore, Defendant DX Corr's pending motion to dismiss is denied, without prejudice to renewal after the stay is lifted.

Finally, the overbroad motions to seal are denied. Due to the need for administrative resolution regarding what material, if any, should be sealed, one additional sealing motion will be entertained, notwithstanding the stay. If no such motion is filed within twenty one days, the papers in question will become public in their entirety.

**IT IS SO ORDERED**.

Dated: April 24, 2023

_____
RICHARD SEEBORG
Chief United States District Judge